Good morning, ladies and gentlemen. Our first case for this morning is United States v. Leiva. Ms. Christensen. Good morning, Your Honors. May it please support counsel. My name is Joanna Christensen. I represent the appellant, Mr. Leiva, in this case. There are two issues primarily that I'm going to argue today. I'll leave the third for the briefing regarding the supervised release. All the issues stem from Mr. Leiva's inability to speak the English language, being primarily a Spanish speaker, or almost exclusively a Spanish speaker. The first is the traffic stop that Trooper Weiss conducted when the three individuals were driving down near Springfield on I-55. Weiss had Leiva in the car, said he was free to go. As Leiva was reaching for the door handle, he said, un momento, and asked him immediately for consent to search the car. In addition to prolonging the initial traffic stop from the point of issuing a ticket, Weiss then started a new traffic stop or an additional stop that wasn't justified by reasonable suspicion. Of course, the government argues that it was consensual, that the un momento, you know, was just, you know, hang on a minute, and Mr. Leiva understood it to be that, and they continued to talk. Well, I think they continued to talk for two sentences, where Trooper Weiss said in Spanish what he thought to mean, can I search your car, which actually meant, can I find your car, and Mr. Leiva said, see, or Weiss said he said, yes, the English word yes, but said see, and that was the extent of the conversation. Unfortunately, Trooper Weiss was relying on a cheat sheet that he had made that inaccurately translated many Spanish phrases, but as is relevant in this case, can I search your car. The correct translation would have been quite different, and I'm apologizing for Spanish speaker, it should have been Puedo Revisor Su Caro, rather than Puedo Buscar Su Coche. Well, coche is a very common word for car in Spanish, and coche is a well-known word, and the government points out that had he typed it into his iPhone, it would have come out Puedo Buscar Su Coche. And still would have been wrong. Well, but the broader point that the district court makes is, and this certainly, I mean, common sense tells you this happens all the time, when people are communicating across languages, you don't always pick quite the right word, but the native speaker understands what you're getting at, and there's the car sitting there 20 to 25 feet away, and the court finds Mr. Leyva didn't think he was being asked, can I find the car? There's the car sitting there, you know, a council table. Instead, he understood that it meant, can I look in your car? And I guess if that, the word en had been added to the sentence, Puedo Buscar En Su Coche, it would have been fine. It's possible. I have very little knowledge of Spanish, however, the experts testified that that was not, would have not been the correct way, and I think if we look at the totality of the circumstances, which is what the district court did, is that, and said Mr. Leyva must have known that he was asking to search the car. I'm not sure that that's clear. You know, I think if someone had asked me, can I find your car, and my car is sitting right there, I would have been like, yeah, yeah, it's right there, and maybe that's my sarcastic nature coming out, that I would have answered a question like that, or the fact that I'm a defense attorney, but actually I probably would have said immediately no to any question as a defense attorney, but I think that he, you know, the car was right there, and he certainly was not familiar with English at all, unlike perhaps... He lived in the United States, though, for quite some time. He lived in Miami in the United States. They don't speak English in Miami? They do. I've never been, but my understanding about Miami is that you can, particularly being a Cuban, isolate yourself with almost exclusively Spanish speakers. You know, there are areas in Chicago where you can speak either Polish or German and get along with English to get to and from. It's possible. I'm sure this guy learned enough English to get on the road anyway, so. Well, he could drive. Got gas, got a license. Right. My guess is in Florida, as in Illinois, the driver's license procedure is also in Spanish. I'm sure that's true. So I think that, but the broader point is, if we really are going to look at the district court also sees, or hears some evidence to the effect that Mr. Leyva is concerned before he even gets out of the car, you know, he's talking to the two women in the car, the thought, the prospect of a search is on his mind, or there's evidence to suggest that, and the district court credits that evidence. And the district court makes what I think is probably a factual finding that he has a way of phrasing the thing, using the word buscar instead of a better word, that he gets it, that he knows he's being asked, can you look in the car? I think that that actually points to the other direction. The two occupants testified that he directed them to put some things in the glove compartment, and if he was looking or thinking about the fact that it might be searched, I think he would have said no if he had understood the question, because he was looking to hide the the evidence that there was in the car. So if he hadn't understood the question, I believe he would have said no, you cannot search. Well, you know, that would be a very sensible thing, except you, as a defense attorney, have probably seen thousands of cases where people inexplicably say yes, you can search, and there the drugs are in the compartment, or they're in the trunk, or they're in the glove compartment. They are where they are, and it's probably because in the real world, our notions of your obligation to respond to a police officer's request are much stricter than than the slightly fictional idea that you're not being coerced that seems to prevail. Right, I think in most of those situations, the officer and the person consenting speak the same language. I think that's the key in this case. If Mr. Lieva had been an though I believe there was another, that the stop had ended and another stop had begun, I think consent would be a valid point in that case. But if we look at the whole circumstances, he was trapped in a car away from the people who had been interpreting to him. Weiss noted that he had not responded when, Mr. Lieva had not responded when he had asked him questions prior until, I believe it was Gallego, had translated for him while they were all three in the car. So how many police officers were around by the time the un momento comment is uttered? I'm not entirely sure. Weiss was in the car and then Chapman was standing on the passenger side of the car, and I believe there was at least one other officer on the scene at that time, and I believe it was the other officer who spoke Spanish. And none of those people, of course, were asked to translate this very important question. I could have seen a question starting out more logically as, where are you going? Is there anything illegal in your car? Which we see quite often, which was also on that cheat sheet. Cash, money, drugs. But he immediately started with the consent. Ms. Christensen, did Mr. Lieva testify in I think that's a common tactical choice, but it's pretty tough to prove that the district court was wrong about his understanding of the situation when he didn't even take the stand to explain that he was confused or misunderstood the question. I think that would have been a different choice. I'm not saying it was a good choice or a bad choice. There are other things that come from having a defendant testify. I understand, believe me. We'll get to that point later. But it's a choice with might have been, perhaps it might have been an easier case for the district court to say, ah yes, you know, my interpretation of him on the stand is that he knew what a trooper vice meant when he asked, even though he asked incorrectly. Well, no. I mean, I would have thought that Mr. Lieva would have been able to say, I misunderstood. That's not, you know, I did not consent. But we don't hate, we don't have that. I understand the burdens on the government and so on. But it's hard to beat something with nothing. I understand that and we believe the totality of the circumstances certainly point to that interpretation of what happened between the two of them in the car alone. Weiss did use later other people to help him interpret when he questioned Mr. Lieva. I want to address a good-faith argument quickly as well. I think that in this case, good faith is, if the court agrees with us on every step up to this, the good-faith exception doesn't apply to a case like this. This was clearly a systemic, continuing use of a bad cheat sheet from the cop. Whether it was bad intentioned, I don't think so. I think that he had probably had situations where he needed this and made it using a translate app that clearly wasn't functioning properly. Well that's the problem with translate apps, but it's about the best you can do in a world where people speak quite a few different languages. I would say Spanish is probably the most common that he's going to find in that court or in Illinois probably. And he had at his disposal officers who spoke Spanish and court interpreters, I'm sure, both state and I'll move on to when Mr. Lieva did testify at trial and the problems in interpretation there. This gets into a much more serious situation because we see that in the morning when Mr. Lieva is testifying, the transcript reads fairly clearly. The interpreter and he seem to be working, the interpreter saying logical things. Then we take a lunch break and a different interpreter comes and it's nearly unreadable in the transcript. There certainly are parts that are very garbled, but as I understand it, Velasco interprets on a couple of days and you're focusing only on the afternoon of the fifth day? Well certainly for the defendant's testimony, yes. I looked this morning to see when she interpreted again and she interpreted a pretrial hearing. There's no other mention that she was the interpreter, although I think she probably was, it just doesn't happen to be in the record anywhere. I was not trial counsel so I can't tell you from that experience. But certainly from our point of view, when it becomes an issue is when she's trying to interpret for our client who's trying to exercise his right to testify and tell the jury his side of the story. Does he ever indicate, you know, based on the ability to review transcripts or the like with counsel, something he was trying to convey that didn't get across? I understand your point that he wouldn't necessarily know at the moment, but that's not the only time available, especially by now. Because it seems to me that he was able to get across his fundamental defense, which was that this whole thing was Gallego and Martin's idea and he was just a dupe who was driving along. So this bit about ever meeting his wife and things like that strikes me as a little peripheral. There were some peripheral issues that certainly were mistranslated as well. We get the difference between what he's wearing, pants, cell phone, a pullover, that sort of thing. But we get into the main issues, who was in control when Velasco's testifying. And I'll answer the first part of your question. Defense counsel said that they had asked Mr. Leyva to kind of give them a signal when he was having trouble understanding the interpreter. And he gave that single signal several times and there were several sidebars and objections to that. And didn't the district court judge respond exactly as defense counsel asked? You know, slow him down, try yes and no answers, you know, give the interpreter time to interpret manageable chunks of testimony. I thought the district court judge was trying pretty hard to respond to this. I think the judge did to a certain point and then it became pretty obvious that those instructions weren't helping. And there's at no other point that the translation is part of the transcribed record or even the audio record because this is the only person who testified in Spanish. So if Velasco had been interpreting at other times it wouldn't be part of the record as we know it because it would not be transcribed by the court reporter at that point. But it becomes, it's a sea change as soon as the lunch break ends and Velasco comes on. Ms. Christensen, I guess I'm not sure I share your view of this. I read through that transcript and I saw what looked to me like, you know, the fairly normal kinds of rough spots in interpretation of testimony and questions and intervention by counsel and by the court at times to stop the private dialogue that might have been going on or to try to get government counsel to ask, say, one question at a time. Compound questions cause problems under these circumstances. But I didn't see any situation where Defense Counsel were kind of raising red flags saying this is so bad, Judge, we've got to stop with a mistrial or we've got to just recess till we can get a different interpreter in here, etc. And so it's not clear to me that this was just all that serious a problem, an unmanageable problem. Well, I think that Defense Counsel raised red flags and saying several times to the judge there was more than one objection about the manner in which it was being interpreted. And the difference for me is that when you start talking about different pronouns and Velasco will say, you know, I said this. Oh no, I meant he said that. No, she said that. And for a jury listening, it would be nearly impossible to determine who was speaking about which issue. And there are issues that we've cited in our, the factual thing about, you know, how we met Martin, who paid for the trip. All of that was in this confounding. Could Defense Counsel have made a motion for mistrial? I think so, and that didn't happen. But I think the district court judge also has a duty at some point to say this is not working. This interpreter clearly is not able to interpret accurately. And the court has a duty to comply with the statute and Mr. Lieva's first amendment, for the memorandum rights. So I see I'm into my... You are finished actually. I see I'm done. Further questions by our colleagues? Thank you. Thank you. Mr. Walters. Good morning your honors. Greg Walters on behalf of the United States. Judge Bauer and I are seeing a lot of Mr. Walters this week. Thank you your honor. If I could begin by addressing the second issue first, since we just addressed the alleged inadequacy of the interpretation services during trial. The question, the constitutional question, is whether the scope or accuracy of the interpretation was subject to grave doubt. There has to first be an inadequacy and then is there a prejudice? Now of course Ms. Christensen makes a very good point. I don't know if you've ever been in a situation where somebody was interpreting for you, but I once was in China where they were interpreting to Chinese judges what I was saying. And I honestly wouldn't have had the faintest idea if they were reading a novel to my audience or whether they were interpreting what I was saying. The whole premise being that you don't speak the other language. So how would Mr. Lieva have known whether Velasco was doing an adequate job interpreting or not? Your honor, I think that would be the question in any case in which an interpreter is used. Well it is, and what are we going to do about it? Because if the interpretation is incompetent, then the defense is being deprived of his ability to testify. I think that's what the Court Interpreters Act speaks to as far as a recording. And your honor brought this up that it's not just during trial in which this record could have been made. As we argued in our brief, the record could have been made post trial. And I respectfully disagree with my colleague who's my friend. But I do believe that that recording is discernible, particularly to a Spanish-speaking individual. I will give you some instances. I don't speak Spanish, have not for a long time, but there are a number of times it struck me as odd in reading the transcript where he would say that's normal. But you know what? When I listened to the recording, I heard him use the term es normal. And so it was being translated as the judge instructed Ms. Velasco to do at defense counsel's instruction, word for word. So that's just one example. Well that's the problem though. In some ways, word for word isn't really right. People say claro all the time in Spanish too, and we don't use that word. You can't just use the direct cognate. No, and I'm just giving you an example though of where that might have been questionable, but yet when you listen that that is what he is saying. But to address the court's question, I think in any case in which you have someone who does not speak English and yet the proceedings are required to be in English, you're going to have an interpreter and no one can know at that point in time, absent a bilingual person other than the interpreter, of whether it's accurate. So that's why we do have the Court Interpreters Act, or as this court stated in Cucco v. Holder, the opportunity post-trial to sit down with a translator or an interpreter to come up with affidavits to point out to the district court as the finder of fact where the inaccuracies happened or where they occurred. You basically have to get daily copy it sounds like. Well, or post-trial I'm talking about. Some of these examples in his brief do appear to be gobbledygook though. Why does that cause us to have confidence in the rest of it? I think for two, well at least for one reason. First of all, a lot of times when it looked like it was confusing, if you continue to read the lines following that, that it was often clarified. I'll give you an example. When he talks about, I sat on a table, I looked at a book, I pointed at my food. That's how I translated English. No one would have an idea looking at that phrase or that terminology of what he was talking about. And yet, when read in the context of that page of the transcript, he's talking about ordering food in an English-speaking restaurant. And by the way, that interpretation that I'm speaking of came from the morning's interpreter, not from Ms. Velasco. There are syntax and grammar issues throughout the transcript, not just with Ms. Velasco. But ultimately what we're looking at is did he get his story across? And I think any fair reading of the transcript or listening to the recording makes that case, that he was an innocent bystander who was duped by these, by Gallego and Martin, that he, it was basically the three monkey story of hear no evil, see no evil, speak no evil. I went on a five, six-day trip, went into a number of stores, and I had no idea what was going on. So even with inadequacies, if we were to presume or assume inadequacies because they have not been demonstrated by the find, through the finder fact making that finding, but even if there were inadequacies, I think there is a lack of prejudice. Whether we look under the harmless error, or under the plain error standard, or we're applying the de novo review, regardless of the burden in this case, Your Honor. Yeah, I was gonna ask you about that. Do you think, I mean, your position has been this is plain error, I suppose, because of the lack of a request for a mistrial. Counsel never actually asks for a substitute interpreter? That's correct, Your Honor. Yeah. And also the other thing I'd like to point out, and with respect, there was only one time that Mr. Leyva raised his hand as if he didn't understand something. It was when Mr. Harris, the prosecutor, asked a three-question compound question. It wasn't multiple times that he raised his hand as if he didn't understand Ms. Velasco, so I would like to clarify that for the record. So absent further questions on the interpreter issue, I would like to then conclude by addressing the search issue, Your Honor. I think Judge Wood used a good term as far as it being bungled, or an awkwardly phrased, I can't think that what we have are two permissible views allowed by the evidence and a choice between them by the district judge not being clearly erroneous. And that is, given the context with the car sitting 20 to 25 feet directly in front of the defendant and of Weiss, and asking that question which is literally translated to, may I search for your car, may I locate your car, that it was understandable what Weiss was asking of the defendant. There's no testimony about what Cuban idiom or Mexican idiom or anybody else's idiom would have been? There was some testimony about a Mexican idiom, potentially. I think Ms. Espina testified that had he said, puedo buscar en su coche, that there were some parts of Mexico from her discussions with other Spanish speakers that that could mean, may I search for in your car. So adding the prepositional phrase EN in Spanish in some parts of Mexico may mean, may I search in your car, which that preposition was not used here. But we think that that question was not so far afield, puedo buscar su coche, and given the immediate, non-hesitant, non-quizzical response of the defendant, I know the counsel was talking somewhat tongue-in-cheek, but I listened to the tone of her voice when she said my response would have been, sure, kind of like either questioning or sarcastically, but that's that's not how Mr. Leiva responded. There was no quizzical response, no questioning, it was non-hesitant and affirmative. The officer then came back with the question or reply C, and Leiva then again said C. It's a little strange though that he's over there in the squad car, usually with these traffic stops, they don't even want the driver to get out of the car because that exposes them. I've seen it both ways, I think you're right Your Honor, predominantly they aren't in the car, but there's nothing that the squad car. Except that the consequence here of doing that is to separate him from anybody who could help him with the language, with the language problem. I certainly agree that that could be a nefarious interpretation of what occurred, but I don't think the officer was required to take him at his word as he's driving down the highway with probably Wisconsin plates on his car and heading to wherever that he doesn't speak English. I think he could require in one way of doing that is to is to possibly separate him and then he realizes no he does not speak English. I don't think that that is necessarily an inappropriate thing and certainly the record wouldn't support a finding that it was constitutionally impermissible to do that. So I think in context that the judge made a finding that is not clearly erroneous and on top of that we do stand by our good-faith argument. In fact, the defense kind of doubles down on that argument. They were the ones to raise that he should have used his iPhone or could have used his iPhone during the most critical, the question of utmost importance. And so we looked up on iTranslate of what that would have been. It's precisely the same question that they take issue with in this case. I'd like to make a couple corrections in the record or at least one that I think is very important. I think counsel stated during her argument that there was a Spanish speaker present at the stop. There were three officers initially what in order it was Trooper Weiss made the stop. Sometime thereafter, Trooper Chapman shows up. Chapman testified. He doesn't speak Spanish. He speaks some Spanish, he said. He's not fluent. Then the third officer was Trooper Mari. The fluent Spanish speaker is Lieutenant Felix Canizares. He testified on page 76 of Record 65, the suppression hearing transcript. What he was involved in was the interview of the defendant which took place at either District 9 or District 7 headquarters. So the record will show that he was not at the scene of the traffic stop? No, ultimately there were there were five that showed up. You had the three troopers during the stop and then during the when the consent to search was obtained. After the search there were two detectives that showed up. One of them's name was John Yard and then the other was, the testimony was, his Secret Service agent, Special Agent Vince Pesticelli, but regardless they were not present during the stop. They came at the time of the search and so you had no one fluent in Spanish at the search itself or prior to the search. So I just wanted to make that clear for the record. So ultimately what we are asking this court to do is to affirm the district court's determination on the consent search that it wasn't clearly erroneous because there are two permissible views of the evidence in this case and then because of the lack of a demonstration of inadequacy of interpretation and even with that inadequacy, if there were one, that in the absence of prejudice, Your Honor, we would say that there is no due process violation with regard to the interpretation services rendered. So what about supervised release before you sit down? Thank you for asking about that. I think in Cappas, United States v. Cappas, this court made clear that what we do is we review the record as a whole and I think it's very clear as to why the judge imposed supervised release in this case. When he first addressed the defendant's objection, which was, I abided by my terms of condition during pretrial release, therefore do not impose supervised release, and I think the respondent of that objection said, you know, there are a lot of cases in which defendants abide by pretrial release conditions, but yet we still impose supervised release in an overwhelming majority of those cases. Now if that were the only finding, Your Honor, that would be insufficient. Just because someone else gets it doesn't mean he should. But when we look at the other statements, this court, which has been on the bench for a long time, he was a constitutional institution. He wanted to ensure these victims are made whole. But he doesn't ever connect the dots. I mean, he says I want you to pay. He even says I'll give you a break, I'll shorten your supervised release if you do, but he never says the one and only reason or one of the five reasons or whatever else it may be, the reason I'm imposing supervised release is to ensure that we've got some pay. I think, though, he almost does completely, to the extent it's required, and I would respectfully disagree that he would have to explicitly do that. But when he states two years, supervised release, if you get the restitution paid, then we'll take off, if you get it paid within the first year, then I'll take it off. I think that's as close as it gets to connecting, but I'll give you an example outside of connecting the dot explicitly, is in United States v. Cappos, with respect to defendant Juergens, Judge Darrow had imposed a term of supervised release, had gone through all the 3553A factors in determining the sentence of imprisonment, didn't necessarily connect those 3553A factors directly to the supervised release, and yet this court looked at the record as a whole and said, you know, that is a sufficient explanation of the 3553A factors to support the imposition of that term of supervised release, and we believe, by analogy, that same reasoning should apply here. And certainly under 3553A7, restitution to victims is an appropriate factor for the District Court to take into consideration. If there are no further questions from the bench, thank you, Your Honors, and we would ask that the Court affirm the judgment of the District Court. Okay, thank you. Now, you ran out of time, Ms. Christensen, but if you want a minute to talk about supervised release, I will give that to you. About the supervised release, I think it's pretty clear that the judge thought, and the primary thought was, well, everybody gets supervised release, and he considered the pretrial, but also didn't consider the fact that Mr. Leavia had no criminal history. He'd never been on probation before, had never needed to pre-sentencing, and always complied. The other issue is that for paying restitution, he is currently paying through the IFRP in prison. His co-defendants are paying because they got shorter sentences and are on supervised release, and the government can continue to collect through their financial litigation unit. The fact of the matter is, in the scope of our cases, this is a little over $3,000 in restitution. It's not a lot that can be other than subjecting Mr. Leavia to supervised release, when he clearly doesn't need it. So, unless the court has other questions, I ask for the court to reverse and remand. All right, thank you very much. Thanks to both counsel.